Peter P. Brotzen # 53230
Steven D. Downer #86186
DWYER, DALY, BROTZEN & BRUNO, LLP
550 South Hope Street, Suite 1900
Los Angeles, California 90071-2632
Tel. (213)627-9300
Fax  (213)624-1638

Attorneys for Defendant
UNITED AIR LINES, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ELINA SHAFFY, | ) | Case No. CV07-4338 GAF (CTx) |
| Plaintiff(s), | ) | NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT |
| vs. | ) | |
| UNITED AIRLINES; UNITED AIRLINES, INC.; UNITED AIR LINES, INC.; UAL CORPORATION; UAL COMPANY SERVICES, INC. dba UNITED UAL COMPANY SERVICES, INC.; AND DOES 1 TO 100 | ) | (Served and Filed Concurrently with Separate Statement of Undisputed Material Facts and Supporting Evidence) |
| | ) | Date: March 17, 2008 |
| Defendant(s). | ) | Time: 9:30 a.m. |
| | ) | Courtroom: 740 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that on March 17, 2008 at 9:30 a.m. in Courtroom 740 of the above-entitled court located at Roybal Federal Courthouse, 255 East Temple Street, Los Angeles, California, Defendant UNITED AIR LINES, INC. will and hereby does move the Court for an Order pursuant to Federal Rules of Civil Procedure, Rule 56, granting Summary Judgment in favor of Defendant UNITED AIR LINES, INC. and against plaintiff ELINA SHAFFY herein.

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

This Motion is made on the grounds that there is no triable issue of material fact and Defendant UNITED AIR LINES, INC. is entitled to judgment in its favor as a matter of law.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on January 22, 2008.

This motion is based upon this Notice, the attached Memorandum of Points and Authorities in Support, the Separate Statement of Undisputed Material Facts and Supporting Evidence served and filed concurrently herewith, the Declarations and Exhibits filed and served concurrently herewith, together with the entire Court file in this matter and such oral and documentary evidence as may be received by the Court at the hearing of this motion.

Dated: February 13, 2008          DWYER, DALY, BROTZEN & BRUNO, LLP

By: _____
    Peter P. Brotzen
    Steven D. Downer
    Attorneys for Defendant, UNITED AIR
    LINES, INC.

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

# TABLE OF CONTENTS

1.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   UNITED HAS BROAD DISCRETION TO REFUSE TO TRANSPORT
     PASSENGERS WHO MAY PRESENT A SAFETY ISSUE . . . . . . . . . . 8

3.   UNITED ACTED WITHIN ITS DISCRETION IN REMOVING
     SHAFFY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.   ALL OF SHAFFY'S CLAIMS ARE PREEMPTED BY THE
     APPLICATION OF SECTION 44902 . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

# TABLE OF AUTHORITIES

## Case Authorities

*Adamsons v. American Airlines* (1982)

    58 N.Y.2d 42, 457 N.Y.S.2d 771 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Al-Qudhai'een v. America West Airlines* (S.D.Ohio 2003)

    267 F.Supp.2d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16, 18, 23

*Celotex v. Catrett* (1986)

    477 U.S. 317, 106 S.Ct. 2548 . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cerqueira v. American Airlines, Inc.* (1st Cir. 2008)

    2008 U.S.App.LEXIS 456 . . . . . . . . . . . . . . . . . . . . . . . . 18-19, 23

*Christel v. AMR Corp.* (E.D.N.Y. 2002)

    222 F.Supp.2d 335 . . . . . . . . . . . . . . . . . . . . . . . . . 16-18, 20

*City of Burbank v. Lockheed Air Terminal, Inc.* (1973) 411 U.S. 624, 93 S.Ct.

    1854, 36 L.Ed.2d 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cordero v. CIA Mexicana de Aviacion, S.A.*

    512 F.Supp. 205, rev'd in part and aff'd in part at 681 F.2d 669 . . . . . . 13

*Cordero v. CIA Mexicana de Aviacion* (9th Cir. 1982)

    681 F.2d 669 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dasrath v. Continental Airlines, Inc.* (D.N.J. 2006)

    467 F.Supp.2d 431 . . . . . . . . . . . . . . . . . . . . . 13-14, 18, 22-23

*Harby v. Saadeh* (9th Cir. 1987)

    816 F.2d 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hodges v. Delta Airlines, Inc.* (5th Cir. 1995)

    44 F.3d 334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Mexico City Aircrash of October 31, 1979* (9th Cir. 1983)

    708 F.2d 400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**DWYER, DALY, BROTZEN & BRUNO, LLP**
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

# TABLE OF AUTHORITIES CONTINUED

**Case Authorities Continued**

*Montalvo v. Spirit Airlines* (9th Cir. 2007)

    508 F.3d 464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11, 21

*Norman v. Trans World Airlines, Inc.* (S.D.N.Y. 2000)

    2000 U.S.Dist.LEXIS 14618, 2000 WL 1480367 . . . . . . . . . . . . . . . . . 17

*Northwest Airlines, Inc. v. Minnesota* (1944)

    322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 . . . . . . . . . . . . . . . . . . . . . . 9

*Pryor v. Nat'l Collegiate Athletics Ass'n* (3d Cir. 2002)

    288 F.3d 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rubin v. United Air Lines, Inc.* (2002)

    96 Cal.App.4th 364, 117 Cal.Rptr.2d 109 . . . . . . . . . . . . . . . . . . 12, 21

*Sedigh v. Delta Airlines, Inc.* (E.D.N.Y. 1994)

    850 F.Supp. 197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Shaeffer v. Cavallero* (S.D.N.Y. 1999)

    54 F.Supp.2d 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Smith v. Comair* (4th Cir. 1998)

    134 F.3d 254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Christensen* (9th Cir. 1969)

    419 F.2d 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Williams v. Trans World Airlines* (2nd Cir. 1975)

    509 F.2d 942 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19, 23

*World Airways, Inc. v. Int'l Brotherhood of Teamsters, Airline Div.* (9th Cir. 1978)

    578 F.2d 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Zervigon v. Peidmont Aviation, Inc.* (S.D.N.Y. 1983)

    558 F.Supp. 1305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

# TABLE OF AUTHORITIES CONTINUED

## Statutory Authorities

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

49 U.S.C. § 44701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

49 U.S.C. § 44902(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

14 CFR § 121.533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14 CFR § 121.589 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Title VI of Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Calif. Business & Professions Code § 17200 . . . . . . . . . . . . . . . . . . . . . 21

Calif. Civil Code § 51 (Unruh Civil Rights Act) . . . . . . . . . . . . . . . . . . 20

Federal Rules of Civil Procedure, Rule 56 . . . . . . . . . . . . . . . . . . . . . . 23

## Other Authorities

14 Am.Jur.2d, Carriers, § 865 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pets in the Passenger Cabin* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

**DWYER, DALY, BROTZEN & BRUNO, LLP**
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

**DWYER, DALY, BROTZEN & BRUNO, LLP**
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

1.     **STATEMENT OF FACTS:**

This action arises from the removal of plaintiff ELINA SHAFFY (SHAFFY) in Las Vegas from a UNITED AIR LINES, INC. (UNITED) flight from Denver to Los Angeles.  SHAFFY was returning to Los Angeles from her vacation in Aspen, Colorado.  The events which give rise to this action begin at the Denver, Colorado airport where Ms. SHAFFY, traveling under the assumed name of Elina "O'NeillShaffy," (See Decla. Byrne ¶¶ 1,-4, Exh.s 1, 2; Decla Anderson, Exh. 8) sporting blond streaked hair, a mink coat, gym bag, suitcase, pet Chihuahua named Lucy, and a pet carrier, was asked to pay the $80 fair required for a pet to ride in the passenger cabin.  When she presented an expired driver's license as identification (See Decla Anderson, Exh.9) and a credit card in the name of Elina Shaffy and the signatures on the driver's license and credit card did not appear to match, there was some delay in processing that payment.  The payment was eventually processed and SHAFFY went to board.  (See Decla. Anderson, Exh. 10, Amnd. Resp. to Interrogs.  "Denver Airport Events")

When SHAFFY arrived at the door to the aircraft, she was asked to check some of her items since, in order to comply with the Federal Aviation Regulations regarding baggage carried in the passenger cabin, United's Contract of Carriage limits "carry-on" items to one piece of carry-on baggage (provided it fits under the seat and meets weight restrictions), plus one "personal item such as a purse, briefcase or laptop," plus "outer garments," "child safety seats" and "assistive devices for disabled passengers." (See Decla. Byrne, ¶8, Exh. 6 - Contract of Carriage "Acceptance of Baggage: General UA Rule 0190 § B) Free Baggage Allowance") SHAFFY exceeded the carry on baggage limit with her suitcase, dog and carrier, lap top, large bag and fur coat.  When SHAFFY was told the flight was very full and she would be required to check some of the items, she was very resistant, seeking to avoid the need to check in her excess carry-on baggage by asserting that all of her carry on items contained "valuables, including passport,

-1-

jewelry, laptop, etc. that cannot be checked."   SHAFFY told the purser "I am allowed two standard carry-ons: one specifically for the pet and the other for my personal items, and what she was asking was against FAA rules and regulations." (See Decla. Anderson Exh. 10, Amnd. Resp. to Interrogs., "Denver Airport Events;" Decla. Blaisdell ¶¶ 4-5)

Captain Lacey overheard and saw part of this exchange and felt that SHAFFY was loud and disrespectful toward the purser.  (Undip. Fact #2)

Whether or not pets are allowed to travel in the passenger cabin is a matter for each carrier to decide.  The FAA considers the pet to be carry on baggage and must be treated as carry on baggage.  As explained by the FAA on its website under the heading "Pets in the Passenger Cabin":

"The Federal Aviation Administration (FAA) allows each airline to decide if they will allow you to travel with your pet in the passenger cabin.  If an airline does allow you to bring your pet in the cabin, we consider your pet container to be carry-on baggage and you must follow all carry on baggage rules (14 CFR part 121, section 121.589):

• Your pet container must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the airplane.

• Your pet container must be stowed properly before the last passenger entry door to the airplane is closed in order for the airplane to leave the gate.

• Your pet container must remain properly stowed the entire time the airplane is moving on the airport surface, and for take off and landing.

• You must follow flight attendant instructions regarding the proper stowage of your pet container. ...

"If an airline allows you to travel with your pet in the cabin, you must follow all FAA regulations.  Usually, most airlines have additional

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

-2-

**DWYER, DALY, BROTZEN & BRUNO, LLP**
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

policies and procedures for you to follow to make sure that the flight is comfortable for all passengers on the airplane. These additional procedures may include ... A requirement that your pet remain in the container for the entire flight." (FAA- Pets in the Passenger Cabin, Decla. Anderson, Exh. 11)

SHAFFY's confrontation at the aircraft door is what first attracted the attention of Captain Lacey who overheard SHAFFY arguing over checking her bags, stating that she did not wish to check her "$25,000 mink coat" and being very disrespectful to the purser. Captain Lacey saw that the dog was in a bag, like a gym bag, with its head sticking out through a partly open zipper. In her excitement, SHAFFY was bumping the dog's head repeatedly into the bulkhead. When the flight attendant pointed that out, SHAFFY snapped back something along the lines of: 'you can't tell me what to do, mind your own business!' (Decla. Lacey, ¶3)

Eventually, valuables were rearranged, items were checked and SHAFFY and Lucy boarded. The purser told SHAFFY before she boarded the aircraft that, "once she got settled" the dog would have to be placed in the carrier and remain there for the entire flight. (Decla. Blaisdell ¶¶ 4-5) During boarding, SHAFFY wanted to ask a flight attendant if there was a later flight to Los Angeles she could take. When a flight attendant did not respond quickly, she pushed her flight attendant call button to get assistance. When she was told by the flight attendant "I'll get to you when I get a chance," SHAFFY demanded to speak with the flight attendant's supervisor and was eventually told that the next flight was "not until 8:00 p.m." Although SHAFFY "decided to relax, as it's a short flight," she nonetheless made a phone call to United Customer Service to lodge a complaint about the whole matter. (Decla. Anderson, Amnd. Resp. to Interrogs. Exhibit 10) SHAFFY's phone call was loud and during that time, she gave "dirty looks" to the purser and other flight attendants. (Dec. Blaisdell ¶ 6)

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

UNITED may allow a passenger to bring a pet in the passenger cabin, under certain conditions specified in the UNITED Contract of Carriage.  The Rules require, among other things, that the animal be "harmless, inoffensive, odorless, and require no attention during transit;" that the pet be "confined in a cage or container subject to inspection and approval by UA, and meet the Department of Agriculture Requirements;" that the passenger "must travel on the same flight as the animal;" that the kennel meet specific dimensional requirements (so that it can fit, as required by FAA Regulations, under the seat); that the kennel "be stored under a seat directly in front of the passenger" (and for that reason passengers with pets are not allowed to sit in a row immediately behind a bulkhead or in an emergency exit row); and, most importantly for the purposes of this action:

**"EE) The animal must remain in the container, and the container must remain closed and sealed from the time of entry into the airplane until after deplaning from the airplane."**(Decla. Byrne ¶8, Exh. 6, "Acceptance of Baggage: General UA Rule 0190" § (A) 7) Miscellaneous Items, B) [1]

Flight Attendant Barbara Blaisdell, recalls passenger "O'NeillShaffy" as a tall, attractive woman, well dressed, wearing high heels and declares that SHAFFY did not look "middle eastern" to her. (See Decla. Blaisdell, ¶3; Decla. Anderson, SHAFFY at Depo., Exh.12)  After takeoff, and while the "fasten seatbelts" sign was still illuminated, Ms. Blaisdell heard the dog barking and went back to where SHAFFY was seated (second to the last row) and found that SHAFFY had Lucy out of the kennel on her lap.  Ms. Blaisdell explained to SHAFFY that the dog must stay in the carrier for the entire flight and then

---

[1] "Tariffs set forth the rules, regulations, classifications, fares and practices governing air transportation [citation].  **Valid tariffs are conclusive and exclusive as to the rights and liabilities between airlines and their passengers** [citation], **even though the passenger may be unaware of the tariff provisions**. [citation]." *Harby v. Saadeh* 816 F.2d 436, 439 (9th Cir. 1987) (emphasis added)

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900

LOS ANGELES, CALIFORNIA 90071-2632

1  returned to the front of the aircraft. (See Dec. Blaisdell ¶ 8)

2      Later, while the "fasten seatbelts" sign was still illuminated. Ms. Blaisdell

3  received a call from one of the other flight attendants who stated that SHAFFY

4  had taken her dog with her into the lavatory.  After SHAFFY left the lavatory, the

5  flight attendant discovered a diaper like pad in the lavatory which they believed

6  the dog had used to go to the bathroom.  Ms. Blaisdell donned rubber gloves and

7  disposed of the pad and then went to talk to SHAFFY. (Decla. Blaisdell ¶ 9)

8      SHAFFY states in her Second Amended Interrogatory Responses:

9  [2]"After we had been up for some time, I use the lavatory in which, I

10  take my dog with me.  While waiting for the stall, the attendant rudely

11  looks at me and says you're not allowed to bring the dog out its

12  carrier.  I explained if my personal items weren't removed into my

13  dog's then maybe my dog could sit comfortably in her bag.  She rolls

14  her eyes, picks up the phone to inform one the crewmembers of the

15  situation.  While waiting the attendant picks up the phone and says

16  the middle eastern passenger with the dog has taking the dog in the

17  stall with her.  I look at her and inquire as to why they are too busy to

18  answer a passenger's call button, but so quick to inform whoever

19  about me taking my dog in the lavatory with me.  I return to my seat

20  and notice the heavyset attendant who forced me to check-in my

21  handbag, marching down the isle, looking livid.  She stops in front of

22  my seat and begins screaming at the top of her lungs while pointing

23  her fingers in my face.  She screams that the dog had better stay in her

24  carrier and this is the final warning.  I explain to her that this is the

25  first time you've addressed this issue with me and I'd appreciate if

26

27  [2]    The interrogatory responses are quoted verbatim.  Although the responses

28  are written in poor and ungrammatical English, SHAFFY spoke with no accent (See
    Dec. Blaisdell ¶ 3)

-5-

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900

LOS ANGELES, CALIFORNIA 90071-2632

you would stop pointing in my face.  I put the dog in the carrier and zipped the carrier as much as possible.  And if you didn't notice my dog is in her carrier I just took her out and held her when I was going to the lavatory.  She began screaming that will be your final warning." (Decla. Anderson, Exh. 10,  Amnd. Resp. to Interrog.s)

During the service, a passenger seated in a emergency exit row told Ms. Blaisdell that the dog had not been returned to its carrier and expressed concern about that, since the passenger said they had been on another flight a dog bit a passenger.  He said something to the effect "the littler the dog, the less patience they have."  Ms. Blaisdell went back and again warned Ms. SHAFFY that the dog must be kept in the carrier for the entire flight. (Decla. Blaisdell ¶ 11)

After beverage and snacks had been served Ms. Blaisdell again returned to Ms. SHAFFY and found again that the dog was in Ms. SHAFFY's lap.  SHAFFY said the dog had been removed from the carrier because she was thirsty and needed water.  Ms. Blaisdell was nearing the end of her patience and warned Ms. SHAFFY that if the dog was not put in her carrier and kept there, that Ms. SHAFFY would not continue on the flight after it landed in Las Vegas.  (Decla. Blaisdell ¶ 12)

Captain Lacey recalls that he received at least three calls from different flight attendants advising that the passenger with the dog had taken the dog out of its kennel, despite having been told that the dog must remain in its kennel. (Undisp. Fact #5)  Captain Lacey had an incident 7 to 8 years ago in which a dog which had been let out of it's kennel defecated on another passenger and caused a disturbance in the cabin. (Decla. Lacey ¶7)  Captain Lacey asked the cabin crew to deal with the situation through the purser, Ms. Blaisdell.  (Undisp. Fact # 4)

Ms. Blaisdell reported to Captain Lacey that the passenger ignored repeated instructions to keep the dog in the carrier, and that the dog being out of the carrier and the passenger's failure to follow repeated instructions constituted a safety

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

issue.  **The purser refused to continue on the flight if the passenger remained on board**.  (Undisp. Fact #5)

Captain Lacey decided, given the passenger's confrontation over her excess carry on baggage, her disrespect for the flight attendants, her failure to follow the flight attendants' instructions and repeatedly allowing the dog out of the kennel, combined with the number of calls coming to the cockpit about the issue, and the fact that the purser was unwilling to continue on to Los Angeles if SHAFFY was not de-planed, that SHAFFY's presence could present safety issues for the remaining flight from Las Vegas to Los Angeles. (Undisp. Facts # 6-7)  Captain Lacey notified UNITED dispatch of his decision and requested law enforcement to meet the aircraft in order to deplane SHAFFY. (Decla. Lacey ¶¶ 8-9)

Ms SHAFFY states in her interrogatory responses that, when the aircraft landed in Las Vegas, she then moved her dog and carrier out from under the seat and onto "an empty seat."  She was then met by a number of personnel, including "federal law enforcement officers .. . with their hand on their guns."  They informed Ms. SHAFFY of the seriousness of her disregard of the flight attendants' instructions and her refusal to keep the dog in its kennel ("they inform me that messing with the crew and or passengers of any flight is a federal crime punishable with a $50,000 bail"). (See Decla. Anderson Exh. 10)  SHAFFY was escorted from the aircraft and was not allowed to re-board.  SHAFFY was detained and then released and admits in her interrogatory responses that she was not arrested.  "You should feel lucky we're not arresting you." (See also Decla. Anderson Exh. 13, TSA Report "Was subject arrested? No")  With the assistance of the local UNITED manager, SHAFFY was able to purchase a ticket on USAir for her and her dog from Las Vegas to Los Angeles.  (Decla. Anderson, Exh 10)

The Transportation Security Administration (TSA) Report indicates that SHAFFY had been told six times by the flight attendants that the dog must remain in the carrier during flight and that the dog was repeatedly taken out of its carrier,

-7-

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

including taking the dog to the restroom.  Nowhere does the TSA Report mention anything regarding SHAFFY's race or national origin.  In fact, the TSA Report does not give any race for SHAFFY, although there is a box in the form for that specific identifying information.   The redacted narrative of the TSA Report indicates that SHAFFY was removed because of her refusal to keep the dog in its carrier despite repeated warnings from the flight attendants.

> "SSS was on board Flight #1491 from Denver to Los Angeles
> stopping in Las Vegas.  While on board in air, SSS took her small dog
> out of its carrier.  SSS was told by Flight Attendant AAA she needed
> to keep the dog in the carrier during flight.  SSS also took the dog out
> when she went to the restroom, and took it with her.  Per attendant
> AAA, SSS was told 6 times to keep her dog in its carrier.  AAA told
> her 3 times F/A BBB told her 1 time, CCC once and DDD also told
> her once."  TSA Report, Decla. Anderson Exh. 13

SHAFFY was not removed from the aircraft because of her ethnicity or nationality as she alleges in her complaint, she was removed from the aircraft because, in the opinion of Captain Lacey, her conduct and her conflicts with the flight attendants over the dog, and the refusal of the purser to continue on the flight if SHAFFY remained aboard, presented a potential safety issue for the flight. (Undisp. Facts # 6-7)

## 2. UNITED HAS BROAD DISCRETION TO REFUSE TO TRANSPORT PASSENGERS WHO MAY PRESENT A SAFETY ISSUE

UNITED contends that it has no liability to SHAFFY for her removal from the aircraft.  Federal law applies to the issue of the refusal of an airline to transport a passenger, sets the standard for such refusal and preempts any state laws. Aviation safety is the exclusive domain of the Federal Aviation Act and the Federal Aviation Administration.

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

"The purpose, history, and language of the FAA (Federal Aviation Act) lead us to conclude that Congress intended to have a single, uniform system for regulating aviation safety.  The catalytic events leading to the enactment of the FAA helped generate this intent.  The FAA was drafted in response to a series of fatal air crashes between civil and military aircraft operating under separate flight rules.  *See United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir.1969) To avoid future disasters, as we have expressed it, "to promote safety in aviation and thereby protects the lives of persons who travel on board aircraft," *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir. 1983), Congress enacted the FAA, "the whole tenor [of which was] to create and enforce one unified system of flight rules." *Christensen*, 419 F.2d at 1404; *see also World Airways, Inc. v. Int'l Brotherhood of Teamsters, Airline Div.*, 578 F.2d 800 (9th Cir. 1978) In discussing the impetus for the FAA, the Supreme Court has also noted that regulating the aviation industry requires a delicate balance between safety and efficiency.  It is precisely because of "the interdependence of theses factors" that Congress enacted "a uniform and exclusive system of federal regulation." *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638-39, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (citations omitted); *see also id.* at 644 (J. Rehnquist dissenting) ("The paramount substantive concerns of Congress in enacting the FAA were to regulate federally all aspects of air safety, ... and, once aircraft were in 'flight,' air-space management ...."); *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303, 64 S.Ct. 950, 88 L.Ed. 1283 (1944) (J. Jackson, concurring) (Planes do not wander about in the sky like vagrant clouds.  They move only by federal permission, subject to federal inspection, in the hands of

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

1 | federally certified personnel and under an intricate system of federal

2 | commands.")" *Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir.

3 | 2007)

4 | *Montalvo, supra*, considered that the Federal Aviation Act "not only

5 | authorizes but affirmatively directs the Administrator of the Federal Aviation

6 | Administration to promulgate regulations for the 'safe flight of civil aircraft in air

7 | commerce'" under 49 USC § 44701.  The *Montalvo* case involved a number of

8 | passengers who alleged claims against various airlines for failure to warn them of

9 | the possibility of developing a medical condition called Deep Vein Thrombosis as

10 | a result of sitting in cramped airline seats on long flights.  The Ninth Circuit held

11 | that all such claims were preempted by the Federal Aviation Act.

> "[It] is clear that Congress intended to invest the Administrator of the
> Federal Aviation Administration with the authority to enact exclusive
> air safety standards.  Moreover, the Administrator has chosen to
> exercise this authority by issuing such pervasive regulations that we
> can infer a preemptive intent to displace all state law on the subject of
> air safety." *Montalvo, supra*, at 471.

The Ninth Circuit held "that federal law occupies the entire field of aviation safety.  Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety." *Montalvo*, at 472.

> "The FAA, together with federal air safety regulations, establish
> complete and thorough safety standards for interstate and
> international air transportation that are not subject to supplementation
> by, or variation among, states.  The district court correctly held that
> because there is no federal requirement that airlines warn passengers

///

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

about the risks of developing DVT, Plaintiffs' negligence claim fails as a matter of law." *Montalvo* at 472

Under the FAA, an airline is made directly responsible for the safety of its passengers, crew, aircraft and cargo, but is not required to provide transportation to any passenger whom *the carrier* decides is *or might be* inimical to safety. The airlines are vested with very broad discretion in this matter.

> "Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane." 14 CFR 121.533

> "(b) Permissive refusal. Subject to regulations of the Administrator and air carrier ... may refuse to transport a passenger or property the carrier decided is, or might be inimical to safety." 49 USC § 44902(b)

Section 44902(b) gives very broad discretion to the airlines to decide which persons and what property it will not transport for safety reasons. **The only test applied to this decision is whether or not the decision was arbitrary or irrational, based upon the information the airline has at the time the decision is made.**

> "...[A]lthough the discretion given an airline under this provision to refuse to transport a passenger for safety reasons is 'decidedly expansive, [it] is not unfettered.' If an airline's refusal of transportation is arbitrary or capricious, its refusal can give rise to a claim by the offended passenger for damages. Stated another way, the decision to accept or refuse to transport a passenger based on considerations of safety and security 'lies exclusively with the air carrier' and if such discretion is 'exercised in good faith and for a

-11-

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

rational reason' it will be upheld." *Rubin v. United Air Lines, Inc.* 96 Cal.App.4th 364, 378, 117 Cal.Rptr.2d 109 (2002)

The leading case in this area, *Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975) rejected the argument that the airline must make an investigation prior to its refusal to transport. The *Williams* court held that the airline's decision is to be judged *only* on the facts known to the airline at the time it made the decision not to transport, without regard to hindsight.

"Congress was certainly aware that decisions under § [44902(b)] would in many instances probably have to be made within minutes of the plane's scheduled take-off time, and that the carrier's formulation of opinion would have to rest on something less than absolute certainty. The statute did not contemplate that the flight would have to be held up or cancelled until certainty was achieved. **The test of whether or not the airline properly exercised its power under § [44902(b)] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight**...." *Williams, supra*, at p. 948 (emphasis added)

Numerous state and federal cases have reviewed and analyzed the nature and extent of an airline's exercise of its right to refuse to transport a passenger for safety reasons. The *only* test applied to this decision is **whether or not the decision is rational when considered in the light of the facts known to the person making the decision** (generally the Captain). The airline's decision may even be made negligently without subjecting the carrier to tort liability.

-12-

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

"We do not believe that Congress, in enacting the Federal Aviation Act, intended to test the airline's discretion to deny passage to certain persons by standards of negligence. "[Airline] safety is too important to permit a safety judgment made by the carrier to be second-guessed months later in the calm of the courtroom by a judge or a jury, having no responsibility for the physical safety of anyone, on the basis of words which are inadequate to convey the degree of excitement and tenseness existing at the time the judgment was made.'" *Adamsons v. American Airlines* (1982) 58 N.Y.S.2d 42, 48, 457 N.Y.S.2d 771 (quoting *Cordero v. CIA Mexicana de Aviacion*, S.A. 512 F.Supp. 205, 206-207, rev'd in part and aff'd in part 681 F.2d 669)

It is reversible error to apply a negligence standard to the refusal to transport decision. *Id.*

"The standard for assessing an airline's decision to refuse to transport a passenger is a very lenient one, requiring only that the carrier's decision not be arbitrary or capricious. Although *Williams* uses the term 'reasonable' among others in describing the scope of the discretion authorized by the statute, it is important to recognize that here, 'reasonable' draws its meaning from the terms accompanying it, and that §44902 does not permit a carrier to be held liable where it is merely negligent in deciding that a passenger might be 'inimical to safety.' See *Adamsons v. American Airlines, Inc.*, 58 N.Y.2d 42, 444 N.E.2d 21, 457 N.Y.S. 771 (N.Y. 1982) ... As *Williams* and later cases applying § 44902 confirm, the statute protects any decision that is not capricious or arbitrary." *Dasrath v. Continental Airlines, Inc.* 467 F.Supp.2d 43, 443-444 (D.NJ 2006)

In *Dasrath*, the Court granted summary judgment in favor of the air carrier against a passenger removed from a flight based on inaccurate information. Two

passengers who were acquaintances, engaged in some completely innocent activities in the terminal and during boarding which, from the perspective of the flight crew and some passengers seemed threatening, especially in light of the fact that Richard Reed, the "shoe bomber," had been apprehended by a flight attendant and then subdued by passengers only a few weeks before.  The plaintiff did not engage in any suspicious conduct and did not even know the two passengers who acted oddly.  The plaintiff was seated in the row behind them and when a passenger identified the two strange acting passengers generally, the Captain thought she had included the plaintiff.  Thus, even though it was undisputed that Mr. Dasrath had not acted suspiciously and did not even know the other two (let alone participate in any of the suspicious conduct), because the Captain had been told the three were together and the conduct of two of them was suspicious (even though in hindsight quite innocent) the airline was within its discretion to remove the plaintiff.  In granting summary judgment in favor of the airline, the Court stated:

> "The ultimate question becomes whether Mr. Dasrath has presented sufficient evidence that would permit a reasonable jury to infer that Continental's proffered reason was not the real reason and that a motivating factor in Mr. Dasrath's removal was his race.  This inquiry is complicated by the fact that the inquiry is not solely about what happened; the inquiry is what Capt. Hamp reasonably believed happened.  It must be assumed that all of Mr. Dasrath's testimony is true, and in fact, there is nothing in his testimony that the court is inclined to disbelieve.  On the other hand, **if Capt. Hamp reasonably believed that something had taken place (even if it had not), his reasonable belief is what is critical, not what actually took place.**"
>
> *Dasrath, supra* at 446 (emphasis added)

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900

LOS ANGELES, CALIFORNIA 90071-2632

In *Al-Qudhai'een v. America West Airlines* (S.D. Ohio 2003) 267 F.Supp.2d 841, it was also held that, under section 44902, the Captain has the right to rely upon information from the flight attendants in making the decision whether or not a passenger might be inimical to safety.  There is no liability even if the flight attendants are mistaken in their reports to the Captain, if the Captain's decision is rational based upon the information the Captain has.  In *Al-Qudhai'een* , two passengers, Saudis living in Arizona, had made a late reservation for a flight from Phoenix to Washington DC.  After they boarded, one of them asked if the other could move forward in the cabin to an empty seat next to him so that they could sit together.  He was told to wait until the flight was airborn, but he ignored that instruction, moved up anyway, then remained seated for the duration for the flight.  That passenger/plaintiff did not do anything else the airline considered as suspicious.  The other passenger/plaintiff entered the first class cabin without permission and proceeded to walk toward the cockpit door and then used the forward lavatory.  He asked one of the flight attendants if the flight was direct to Washington and appeared to be irritated and uneasy when he was told the flight would have a stopover in Columbus, Ohio.  The flight attendants thought it was also unusual that Al-Qudhai'een asked if the aircraft they were on would be the same one they would take for the leg from Ohio to Washington.  Also, one flight attendant believed that Al-Qudhai'een touched the cockpit door handle when he went to the forward lavatory, a fact which Al-Qudhai'een strongly denied.  That factual dispute between the flight attendant's recollection and the plaintiff's recollection was held to be immaterial, since **only the information which the Captain used to make his decision is relevant under section 44902.**

"The factual conflict between the parties regarding whether plaintiff Al-Qudhai'een touched the door to the cockpit is not material and the Court does not rely on this dispute in reaching its conclusion.  The Court is only required to assess what was known to Captain Patterson

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

1    at the time he made the decision to call America West officials, not to

2    look beyond the flight attendants representations.  See *Christel v.*

3    *AMR Corp.*, 222 F.Supp.2d 335, 340 (E.D.N.Y. 2002)" *Al-*

4    *Qudhai'een, supra,* at p. 847

5    Thus, factual disputes between the flight attendant, the plaintiff and even

6    other passengers do not constitute a triable issue of material fact, since the only

7    relevant facts are those known to the decisionmaker.  In *Christel v. AMR*

8    *Corporation*, 222 F.Supp.2d 335 (E.D.N.Y. 2002) as the aircraft was taxiing to

9    take off, a flight attendant called the cockpit to report "that there was a disruptive

10   passenger who had interfered with and distracted her from her safety-related duties

11   by throwing a carry-on bag into the aisle and refusing to comply with the stowage

12   of the carry-on baggage." *Christel* at 338.  The aircraft returned to the terminal and

13   the passenger was forcibly removed by the police.

14   In opposing the airline's motion for summary judgment, the passenger

15   plaintiff denied that he had thrown any carry-on luggage or acted disruptive in any

16   way and further "a total of thirteen passengers gave Christel their names and

17   addresses to back him up in the event he wanted to complain about [Flight

18   Attendant] Matheson's behavior. ... James Deegan, one of the passengers on that

19   flight stated in his affidavit that he did not observe Christel throw a bag, or act in a

20   belligerent manner, nor did he hear Christel speak in a loud or abusive manner. ...

21   In fact, according to Deegan, Mathieson was uncontrollably angry." *Christel* at

22   338.  Accordingly, plaintiff Christel argued that his removal from the aircraft was

23   not within the airline's discretion under section 44902 because it was based upon

24   false information provided by the airline's employee Mathieson and therefore was

25   arbitrary and capricious. *Christel* at p. 339.  In rejecting this argument and

26   granting summary judgment for the airline, the Court stated:

27   "A captain of an airplane is entitled without further inquiry to rely

28   upon a flight attendant's representations that a conflict with a

-16-

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

passenger might distract the flight attendant from performing his or her safety-related duties. *See [Norman v. Trans World Airlines, Inc.* 2000 U.S.Dist.LEXIS 14618, 2000 WL 1480367, at *3 (S.D.N.Y. Oct. 6, 2000)] citing *Sedigh [v. Delta Airlines, Inc.* 850 F.Supp. 197, 201 (E.D.N.Y. 1994)] at 202 (holding that although passenger's remarks were misunderstood by cabin crew, airline acted reasonably in removing him without further detailed inquiry)); *Zervigon v. Piedmont Aviation, Inc.* 558, F.Supp. 1305, 1307 (S.D.N.Y. 1983) (holding that pilot's reliance on inferential multiple hearsay in removing passenger because of potential hijacking risk was reasonable under the circumstances).

"In this case, Mathieson called the cockpit on the aircraft's interphone, and stated to Captain Nelson that there was a disruptive passenger who had interfered with and distracted her from her safety-related duties by throwing a carry-on bag into the aisle and refusing to comply with her instructions regarding the stowage of carry-on baggage.  After Captain Nelson received this safety-related message from the only flight attendant on board the airplane, while the aircraft began to taxi toward the runway for takeoff, he acted within his discretion when he made the decision to remove Christel from the plane.  Even if the battle of the egos escalated to Mathieson making exaggerated or even false representations to the Captain, Captain Nelson did not have an obligation to leave the cockpit and investigate the truthfulness of Mathieson's statements.  *See Norman*, 2000 U.S.Dist. LEXIS 14618, 2000 WL 1480367, at *3; *cf Shaeffer [v. Cavallero*, 54 F.Supp.2d 350 (S.D.N.Y. 1999)] at 352 (holding that a jury could find that defendants acted in an arbitrary and capricious manner in removing plaintiff on the grounds of a safety risk where

DWYER, DALY, BROTZEN & BRUNO, LLP

550 SOUTH HOPE STREET, SUITE 1900

LOS ANGELES, CALIFORNIA 90071-2632

they observed his loud protests of a non-safety related matter, i.e. their refusal to give him a baggage receipt).  Since the record is devoid of any indication that Captain Nelson's decision to refuse Christel transportation was "retaliatory or malevolent" [citation] such discretion was not arbitrary and capricious.  Accordingly, defendants are entitled to summary judgment on Christel's tort claims arising from the decision to remove him from the plane." *Christel* at 339-340

"This inquiry is complicated by the fact that the inquiry is not solely about what happened; the inquiry is what Capt. Hamp reasonably believed had happened." *Dasrath*, supra at 445

"Taking into account all the circumstances known to Captain Patterson at the time he made the decision to radio America West for assistance and the fact that he is entitled to rely on the information provided to him by his crew despite any exaggerations or false representations, the Court finds as a matter of law that Captain Patterson's decision to remove plaintiffs from the airplane and to request a search of their baggage was not arbitrary or capricious." *Al-Qudhai'een, supra* at 847.

"Review of a decision to refuse to transport is restricted to what information was actually known by the decisionmaker at the time of the decision.  The test is not what the decisionmakers reasonably *should* have known.  Courts have routinely refused to permit consideration of information not actually known to the decisionmakers. *See e.g. Dasrath*, 467 F.Supp. 2d at 446 ("If the Captain reasonably believed that something had taken place (even if it had not), his reasonable belief is what is critical, not what actually

-18-

took place." *Cerqueira v. American Airlines, Inc.* 2008
U.S.App.LEXIS 456 (1ˢᵗ Cir. 2008) at *33

The *Williams* test was expressly adopted by the Ninth Circuit in *Cordero v. CIA Mexicana de Aviacion* 681 F.2d 669, 672 and fn. 3 (9ᵗʰ Cir. 1982)

> "The reasonableness of the carrier's opinion, therefore, is to be tested on the information available to the airline at the moment a decision is required. There is correspondingly no duty to conduct an in-depth investigation into a ticket-holder's potentially dangerous proclivities. We believe this facet of the test provides a reasonable balance between safety concerns and the right of a ticket-holder to be free from unwarranted discrimination." *Cordero, supra*, at p. 672 (citing 14 Am.Jur.2d, Carriers, § 865 at 309 and *Williams, supra*)

In the case before this Court, the inquiry must therefore necessarily focus on Captain Lacey and the information available to him at the time he made the decision to remove SHAFFY from the aircraft in Las Vegas and whether his decision was rational in light of those facts. (Undisputed Facts # 1-7)

## 3.   UNITED ACTED WITHIN ITS DISCRETION IN REMOVING SHAFFY

The facts and information available to Captain Lacey at the time he decided to remove SHAFFY (Undisp. Facts # 1-7) are set forth in the declarations of Mike Lacey and Barbara Blaisdell. Captain Lacey (Undip. Fact #1) had overheard the confrontation between SHAFFY and Blaisdell at the door to the aircraft over the excess carry-on baggage. He recalls that SHAFFY was very disrespectful to the purser and very resistant to following the rules. Significantly, he heard SHAFFY tell the purser "you can't tell me what to do" and this caused him concern over whether or not she might continue to have conflicts with the flight attendants

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

during the flight. (Undisp. Fact #2)  He did not see her face and she had no accent. (Undisp. Fact #3; Decla. Blaisdell ¶ 3)  He was unaware of SHAFFY's nationality or race until after this lawsuit was filed. (Undip. Fact #7)  He had received calls from different flight attendants stating that the passenger would not keep the dog in its carrier.  He directed them to deal with the issue through the purser. (Undsip. Fact #4)  When he was later contacted by the purser, she reported that the passenger had been told multiple times that the dog must remain in the carrier but the dog was repeatedly brought out, including taking the dog to the lavatory and that the purser refused to go on with the trip if the passenger remained on board because the purser found her presence to be a safety issue, interfering with her ability to perform her safety related job duties. (Undisp. Facts # 5-7)

> "A captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a conflict with a passenger might distract the flight attendant from performing his or her safety-related duties."  *Christel v. AMR Corporation* 222 F.Supp.2d 335, 339 (E.D.N.Y. 2002)

Captain Lacey's decision to deplane SHAFFY in Las Vegas was well within the discretion granted under section 44902.  The decision was not arbitrary or capricious.  The decision was not motivated by SHAFFY's nationality or race, but was motivated by a concern for the safety of the flight.

## 4.    ALL OF SHAFFY'S CLAIMS ARE PREEMPTED BY THE APPLICATION OF SECTION 44902

Plaintiff's complaint alleges claims under "California Civil Code § 51 et.seq. Unruh Civil Rights Act" (First cause of action); "Title VI of the Civil Rights Acts of 1964" (Second cause of action); Discrimination in the Making and Enforcement of Contracts 42 U.S.C. § 1981" (Third cause of action); "defamation/libel/slander" (Fourth cause of action); "Intentional Infliction of

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

-20-

Emotional Distress" (Fifth cause of action); "Negligent Infliction of Emotional Distress" (Sixth cause of action); "Failure to Properly Hire, Supervise, Retain and Fire Employees" (Seventh cause of action); and "Unfair Competition, Including Under the Business and Professions Code §17200 (Eighth cause of action).

To the extent the plaintiff's claims are based upon state law (First, fourth, fifth, sixth, seventh and eighth causes of action) they are preempted by the Federal Aviation Act.  49 USC 44902 sets the standard of conduct for an airline in removing a passenger for safety reasons and is not subject to any change or alteration under any state laws.  Said another way, if the carrier acts within the discretion granted to it under the section 44902 of the Federal Aviation Act, it cannot be held liable in tort for any claims arising from the refusal to transport the passenger. *Rubin v. United Air Lines, Inc.* 96 Cal.App.4th 364; 117 Cal.Rptr.2d 109 (2002); *Montalvo v. Spirit Airlines* 508 F.3d 464 (9th Cir. 2007)

"If passengers could challenge airline's boarding procedures under general contract claims alleging failure to transport, we would allow the fifty states to regulate an area of unique federal concern - airlines' boarding practices. See *Hodges v. Delta Airlines, Inc.* 44 F.3d 334, 339 (5th Cir. 1995) (en banc) (allowing claims alleging wrongful exclusion from flights 'would result in significant de facto regulation of the airlines' boarding practices'). Pursuant to 49 U.S.C. § 44902(b), airlines must be accorded broad discretion in making boarding decisions related to safety. Allowing Smith's claim to proceed would frustrate this important federal objective. Airlines might hesitate to refuse passage in cases of potential danger for fear of state law contract actions claiming refusal to transport. ... To the extent Smith's intentional tort claims are premised on Comair's refusal to permit his to board his flight, we believe they are preempted." *Smith v. Comair* 134 F.3d 254, 258-259 (4th Cir. 1998)

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

-21-

SHAFFY's state law claims are preempted by the federal issue involved, by the implied field preemption of airline safety, by conflict preemption (to the extent any state law would create a different standard of care than section 44902) and by the express preemption found in the Airline Deregulation Act.

In order to avoid summary judgment on the federal claims, SHAFFY must present evidence that demonstrating that Captain Lacey's decision to remove her the aircraft was not because of her refusal to return the dog to its kennel nor because the conflict between SHAFFY and the purser had deteriorated to the point that the purser refused to continue on if SHAFFY remained on the flight. SHAFFY must put on evidence that Captain Lacey's proffered justifications for her removal are a pretext and that Captain Lacey's real reason was a discriminatory one based on SHAFFY's race or national origin. *Dasrath v. Continental Airlines, Inc., supra* 467 F.Supp.2d at p. 444.

"The second of the two critical policy concerns involved in this case - the prevention of discrimination based on race or national origin - is embodies in numerous statutes, state a federal. To establish a case of unlawful discrimination under § 1981(a), plaintiff must show: (1) plaintiff's membership in a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002). Under Title VI, a plaintiff must demonstrate (1) membership in a minority; (2) intentional discrimination; and (3) receipt of federal funds by the defendant. ¶Generally, to survive summary judgment in a claim for unlawful discrimination, be it under § 1981 [or] Title VI ... a plaintiff is required to establish a prima facie case of discrimination. Then the burden shifts to the defendant to articulate a legitimate, non-

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]

discriminatory reason for the alleged discriminatory conduct.  Should the defendant offer such a reason, the plaintiff can survive summary judgment by submitting evidence that the defendant's evidence that defendant's justification is merely a pretext." *Dasrath* at p. 444

Case law establishes that the specific grant of authority to refuse to transport passengers for safety reasons found in section 44902 trumps the general anti-discrimination statutes.  Thus, where the removal of a passenger is within the carrier's discretion under section 44902, no claim for discrimination under section 1981 or Title VI can be made. *Cerqueira v. American Airlines* 2008 U.S.App.LEXIS 456 at *24-26 (1st Cir. 2008), citing *Williams, supra*; *Dasrath, supra*; and *Al-Qudhai'een, supra*.  Therefore, plaintiff's claims under section 1981 and Title VI (second and third causes of action) are also preempted by the application of section 44902.

The liberal pleading rules of the federal courts allow plaintiffs to assert claims which have no evidentiary support.  A motion for summary judgment under Rule 56 pierces the bare pleading of claims by requiring the plaintiffs to affirmatively come forward with substantial evidence supporting the allegations in the complaint.  *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 325, 106 S.Ct. 2548

In accordance with the Court's standing Order, the standards for granting summary judgment under Rule 56 will not be belabored here.   There is no triable issue of material fact and defendant UNITED AIR LINES, INC. is entitled to judgment in its favor as a matter of law.

## 5.   CONCLUSION

SHAFFY alleges that she was wrongfully removed from a UNITED flight between Denver and Los Angeles because she is Iranian.  SHAFFY has no evidence to support her claims.  UNITED has discretion under federal law to refuse to transport any "passenger or property the carrier decides is, or might be

DWYER, DALY, BROTZEN & BRUNO, LLP
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

-23-

1   inimical to safety." The carrier's decision is only reviewed in the courts to

2   determine if the decision was objectively rational, considering the facts available

3   to the Captain at the time he made the decision. Captain Lacey witnessed a

4   confrontation between SHAFFY and the purser and felt that she had been very

5   disrespectful. He had received at least three calls throughout the flight stating that

6   the passenger had taken the dog out of its kennel and ignored repeated instructions

7   to keep the dog in its kennel. The purser refused to go on with the flight. This

8   constitutes a rational safety reason for SHAFFY's removal and entitles UNITED

9   to summary judgment.

11   Dated: *February 13, 2008*   DWYER, DALY, BROTZEN & BRUNO, LLP

13   By: _____

     Peter P. Brotzen
     Steven D. Downer
     Attorneys for Defendant, UNITED AIR
     LINES, INC.

**DWYER, DALY, BROTZEN & BRUNO, LLP**
550 SOUTH HOPE STREET, SUITE 1900
LOS ANGELES, CALIFORNIA 90071-2632

-24-

MOTION FOR SUMMARY JUDGMENT [FRCP RULE 56]